UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| CATHERINE THOMPSON, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CV 2487 DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Catherine Thompson for supplemental security income benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United Magistrate Judge pursuant to 28 U.S.C § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is affirmed.

## I. BACKGROUND

Plaintiff Catherine Thompson, who was born in 1966, filed an application for Title XVI benefits on January 4, 2011. (Tr. 162-67.) She alleged a disability onset date of March 2, 2010, due to auditory hallucinations, severe depression and suicidal thoughts, cardiovascular disease, hypertension, chronic headaches, and dizzy spells. (Tr. 230.) Her application was denied initially on March 29, 2011, and she requested a hearing before an ALJ. (Tr. 100-04, 109-11.)

On August 24, 2012, following a hearing, the ALJ found that plaintiff was not disabled. (Tr. 6-22.) On November 14, 2013, the Appeals Council denied her request for review. (Tr. 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On September 5, 2004, plaintiff met with Muha Azharuddin, M.D., at Pemiscot Memorial Hospital in Hayti, Missouri, with a chief complaint of a headache. She reported that her headache was extreme, and that she was seeing black spots. Plaintiff further reported that she had run out of Fioricet, used to treat tension headaches. Plaintiff was prescribed Darvocet N for pain. (Tr. 394.) On September 8, 2004, plaintiff was seen at Pemiscot Primary Care Center stating that she needed refills for headache medication. (Tr. 460.)

On February 16, 2005, plaintiff met with Abdullah Arshad, M.D., at Pemiscot Memorial Hospital with complaints of severe headache and associated distress, photophobia (sensitivity to light), and phonophobia (sensitivity to loud sounds). Plaintiff reported that she had run out of Fioricet. Dr. Arshad refilled her Fioricet prescription. Dr. Arshad diagnosed "disabling migraine headaches" and hypertension. (Tr. 456.) Plaintiff was seen at Pemiscot Memorial Hospital two more times for her migraines during February 2004. (Tr. 391, 455.)

On March 16, 2005, plaintiff met with Dr. Arshad for follow-up. He diagnosed migraines and hypertension. Dr. Arshad informed plaintiff that he could not prescribe more Fioricet "until it's time" and scheduled a follow-up. Plaintiff saw Dr. Arshad again on April 5, 2005 and he refilled her Fioricet prescriptions. (Tr. 453-54.)

On April 5, 2005, plaintiff saw Dr. Arshad for her migraine headaches and to request a Fioricet refill. (Id.)

On May 6, 2005, plaintiff was admitted to Pemiscot Memorial Hospital for epistaxis (bloody nose), migraine headaches, and uncontrolled hypertension. She was started on pain medication for her headaches and her epistaxis was controlled. A CT scan

of the brain found no significant abnormalities. Dr. Arshad noted that he suspected plaintiff was abusing her pain medication. She was discharged the following day. (Tr. 411-13, 421.)

On May 8, 2005, plaintiff was admitted again to Pemiscot Memorial Hospital for epistaxis, severe migraines, uncontrolled hypertension, and depression. Her headaches and blood pressure were brought under good control and she was discharged the following day. Dr. Arshad noted that he questioned the objectivity of her complaints. (Tr. 465-67.)

Plaintiff saw Dr. Arshad on May 26, 2005 for follow-up. Plaintiff still had headaches and was unable to afford Fioricet at that time. (Tr. 450.) Plaintiff was seen nine more times for her headaches during 2005. (Tr. 362, 442-46, 448, 450, 523, 531.)

Plaintiff saw doctors seventeen times regarding her headaches in 2006. (Tr. 340-42, 355-56, 437-43, 463, 472-73.) She underwent four CT scans of her head in 2006, all of which were normal. (Tr. 471-74.)

On January 14, 2007, plaintiff was seen in the Pemiscot Memorial Hospital emergency room for a migraine headache. A CT scan revealed no significant abnormalities. (Tr. 292-93.) Plaintiff sought medical treatment for her headaches approximately five times during 2007. (Tr. 427-31, 541, 546.)

On November 26, 2007, plaintiff was seen at Saint Louis University Care for counseling for depression. She denied any auditory, visual, or tactile hallucinations at that time. (Tr. 580-82.)

During 2008, plaintiff sought treatment for her headaches four times. (Tr. 424-26, 549.)

On June 6, 2009, plaintiff was seen at Barnes Jewish Hospital emergency room in St. Louis, Missouri, complaining of a migraine headache after running out of her Fioricet two days earlier. (Tr. 558-63.)

On January 24, 2010, plaintiff was seen in the Barnes Jewish Hospital emergency room complaining of a headache after running out of her migraine medication. (Tr. 584, 588-90.)

On February 27 and October 25, 2010, plaintiff saw Lavert Morrow, M.D., for headaches. Dr. Morrow prescribed butalbital/acetaminophen/caffeine tablets, the generic equivalent of Fioricet. Plaintiff denied any additional symptoms in association with her headaches (Tr. 652-53.)

On January 29, 2011, plaintiff was seen at the emergency department at Barnes Jewish Hospital for a headache after running out of medication. She denied any additional symptoms in association with her headache. (Tr. 852-57.)

Plaintiff saw Dr. Morrow on February 4 and March 21, 2011. He noted that her headaches returned if she was out of medication for two weeks. Dr. Morrow diagnosed tension headaches and hypertension, and prescribed butalbital/acetaminophen/caffeine. Plaintiff described fatigue and phonophobia in association with her headaches. (Tr. 872-74.)

On March 17, 2011, plaintiff was seen by licensed psychologist Lynn Mades, Ph.D., for a psychological evaluation regarding her disability claim. Plaintiff described auditory hallucinations, severe depression and suicidal thoughts, cardiovascular disease, chronic headaches, and dizzy spells during this meeting. Plaintiff stated that she was hearing the voices of her deceased family members. Plaintiff reported significant weight loss that she associated with these hallucinations. Dr. Mades noted that there were inconsistencies in plaintiff's account of hallucinations, and stated that plaintiff may have been embellishing symptoms. Dr. Mades determined that plaintiff's complaints of auditory hallucinations were marginally credible at best. Dr. Mades diagnosed plaintiff with major depressive disorder, single episode, mild, and described her prognosis as fair to good with appropriate intervention. (Tr. 729-33.)

On March 29, 2011, Marc Maddox, Ph.D., submitted a Psychiatric Review Technique form. He found that plaintiff's medically determinable impairments consisted of major depressive disorder, single episode, mild. He stated that plaintiff suffered mild

restriction with daily living activities, mild difficulty with maintaining social functioning, and mild difficulty with maintaining concentration, persistence, or pace. (Tr. 734-45.)

On March 29, 2011, Dr. Maddox also submitted a Mental Residual Functional Capacity (RFC) Assessment. He concluded that plaintiff was moderately limited in her ability to understand and remember detailed instructions; to carry our detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; and to interact with the general public. He believed she retained the ability to understand, remember, and carry out simple work instructions; to maintain adequate attendance and an ordinary routine without special supervision; to interact adequately with peers and supervisors in a work setting where demands for social interaction are not primary job requirements; and to adapt to most usual changes in a competitive work setting. (Tr. 746-48.)

On April 9, 2011, plaintiff was seen in the emergency room at Barnes Jewish Hospital with a headache after she had run out of Fioricet. Sean Fitzmaurice, M.D., prescribed Fioricet. She had come to the emergency room because she could not see her primary care provider for a refill at that time. Plaintiff reported feeling much better following the administration of Fioricet. (Tr. 790-95.)

On April 22, 2011, plaintiff was seen at St. Mary's Health Center Emergency Department with a migraine headache and needing to refill her migraine medicine. She had run out migraine medicine and was unable to see her doctor until the following week. Plaintiff was administered Fioricet and discharged. (Tr. 753-56, 876.)

On April 25, 2011, plaintiff saw Dr. Morrow for a tension headache associated with phonophobia and photophobia. Dr. Morrow noted that plaintiff reported her headaches were much better with medications. (Tr. 871.)

On July 2, 2011, plaintiff was admitted to the emergency department at Barnes Jewish Hospital with a headache after running out of medication. She was prescribed Fioricet and discharged. (Tr. 771-76.)

On July 5, 2011, plaintiff saw Dr. Morrow for a check-up. Dr. Morrow noted that plaintiff admitted to persistent headaches after running out of medication. She was

diagnosed with tension headaches associated with phonophobia and photophobia. (Tr. 869.)

On August 3, 2011, plaintiff saw Dr. Morrow for follow-up. She was diagnosed with tension headaches and hypertension. She reported improvement with Fiorinal, used to treat tension headaches. (Tr. 868.)

On September 7, 2011, plaintiff was admitted to the emergency department at Barnes Jewish Hospital for a refill of her headache medication. She denied any additional symptoms in association with her headache. Chandra Aubin, M.D., prescribed Fioricet, and plaintiff reported feeling much better with medication. (Tr. 892-98.)

On December 16, 2011, plaintiff was admitted to the emergency department at Barnes Jewish Hospital for a medication refill. Plaintiff denied any additional symptoms in association with her headache. Dr. Fitzmaurice prescribed Fioricet. (Tr. 918-24.)

On December 21, 2011, plaintiff saw Dr. Morrow for a refill of her prescriptions, including Fioricet. (Tr. 947.)

On March 5, 2012, plaintiff saw Dr. Morrow for a check-up. Plaintiff reported feeling somewhat better with Fiorinal. Dr. Morrow noted that plaintiff felt well, was taking medications as prescribed, and had no headache at that time. Her hypertension was ok at that time. (Tr. 945.)

On June 4, 2012, plaintiff saw Dr. Morrow for a follow-up. Dr. Morrow noted that plaintiff felt well, had no headache, and was compliant with medication. Dr. Morrow further noted that plaintiff's headaches were persisting, but that she received some relief with medication. (Tr. 943.)

**Testimony at the Hearing**

On July 11, 2012, plaintiff, represented by counsel, appeared and testified to the following at a hearing conducted by an ALJ. (Tr. 39-67.) She was 46 years old. She dropped out of high-school in the ninth grade and has not obtained a GED. (Tr. 43.) She has a limited ability to spell and perform basic math. She never received special education, but was held back several grades in school, and describes herself as slow.

She has never obtained a driver's license. She has twelve children but does not have custody of them due to termination of her parental rights. She has never used drugs. She has previously used alcohol but does not currently drink. She previously received SSI for a period of three years due to depression. (Tr. 50-58.)

She last worked from February 2009 to March 2010 as a self-employed babysitter for her grandchildren. She discontinued this employment when her daughter resumed full-time care of her children. She worked as a temporary employee in 2009 performing janitorial services. (Tr. 43-46.) She received one month of job training to learn to roll newspapers in 1999. (Tr. 60-61.) She cannot work because she suffers from severe headaches. She has seen, her treating physician, Dr. Morrow, for her headaches for 19 years. (Tr. 52.) She receives Medicaid for birth control only. (Tr. 54.)

She attributes her headaches to high blood pressure. During a headache, she has weakness, dizziness, sensitivity to noise, alterations to her vision, and is not able to hold her head up. She does not experience nausea during her headaches. She receives temporary relief from her headaches by running cold water over her head. Her headaches are diminished with medication. (Tr. 46, 52.)

She has experienced auditory hallucinations for three to four years. She hears her mother and deceased daughter speaking to her. She sometimes hears these voices through her television. She previously received treatment at a mental health facility, but has discontinued the treatment because it is not covered by Medicaid. She has crying spells approximately twice a month due to thoughts about her deceased family members and loss of custody of her children. She has suicidal thoughts. She maintains personal hygiene with the assistance of her daughter. Her headaches have increased in severity following a blow to her head in 1996. (Tr. 52-57.)

Vocational Expert (VE) Thomas Reed also testified to the following at the hearing. Plaintiff's last job was as a babysitter, a semi-skilled job. As performed by plaintiff, it was a light exertion level job. Prior to her job as a babysitter, she worked as a janitor, which is medium and unskilled work.

The ALJ questioned the VE about a hypothetical individual with an eighth grade education, the same work history as plaintiff, no physical limitations, and who could retain and understand simple instructions, sustain an ordinary routine without special supervision, interact with peers and supervisors, should maintain interaction with the public only occasionally, and is able to adapt to usual changes common in a competitive work setting. The VE testified that such a person would be unemployable as a babysitter but would be employable as a janitor. (Tr. 61-62.)

The ALJ presented a second hypothetical scenario that was identical to the first, except that the individual would be limited to environments without concentrated exposure to noise, vibrations, and hazards. This hypothetical limitation was designed to simulate the reported limitations of plaintiff's headaches. The VE responded that such a person could not perform plaintiff's past relevant work but could perform work as an electrical or electronics assembler at an unskilled and light exertion level. Additionally, the VE stated that the hypothetical individual could be employed as a light assembly worker or fabricator, which is unskilled, light work. The VE responded that such an individual could be employed as a hand packer or packager.

Plaintiff's attorney then posed a third hypothetical, with the additional limitation that the claimant would be required to leave their workstation for 30 minutes a day that could not be accommodated by breaks. The VE testified that such a claimant might be able to secure employment, but not able to maintain it. (Tr. 62-66.)

### III. DECISION OF THE ALJ

On August 24, 2012, the ALJ issued a decision that plaintiff was not disabled. (Tr. 6-22.) At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 4, 2011, her alleged onset date. At Step Two, the ALJ found that plaintiff's depression was a severe impairment. The ALJ found no indication that plaintiff's headaches limited her ability to function. The ALJ found that plaintiff received conservative treatment for her headaches and they were controlled with

medication, and were therefore not a severe impairment. At Step Three, the ALJ found that plaintiff had no impairments or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 11-12.); see 20 C.F.R. pt. 404, subpt. P, app. 1.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with additional nonexertional limitations. She retained the ability to understand, remember, and carry out simple, repetitive tasks. She could maintain attention and routine instructions without supervision, could interact with peers and supervisors but only occasionally with the public. She should avoid concentrated exposure to noise, vibrations, and hazards.

At Step Four, the ALJ found that plaintiff was unable to perform her past relevant work. (Tr. 13-15.) At Step Five, the ALJ found that plaintiff was capable of performing jobs existing in significant numbers in the national economy. (Tr. 16.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be

expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred (1) in finding that her headaches were not a severe impairment, (2) in making his RFC assessment, and (3) in posing a hypothetical question that did not accurately represent the concrete circumstances of her impairment.

### A. Plaintiff's Headaches

Plaintiff argues that the ALJ at Step Two erred in finding that plaintiff's headaches were not a severe impairment. This court disagrees.

At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). The claimant bears the burden of proving her impairment or combination of impairments

is severe, but the burden is not a heavy one, and any doubt concerning whether the showing has been made must be resolved in favor of the claimant. Id.; Dewald v. Astrue, 590 F. Supp.2d 1184, 1200 (D.S.D. 2008). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. . . ." Kirby, 500 F.3d at 707.

A severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities. See 20 C.F.R. §§ 416.920(c), 416.921. An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities. Kirby, 500 F.3d at 707; 20 C.F.R. § 416.921(a). Basic work activities concern the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 416.921(b). Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. Id. The sequential evaluation process terminates at Step Two if the impairment has no more than a minimal effect on the claimant's ability to work. Kirby, 500 F.3d at 707; Hudson v. Bowen, 870 F.2d 1392, 1396 (8th Cir. 1989.

Here, the ALJ determined that plaintiff's headaches were not a severe impairment because they did not cause any limitations on plaintiff's ability to work. The record indicates that the ALJ's conclusion of non-severity is supported by substantial evidence. The ALJ concluded that plaintiff's headaches did not significantly limit her ability to perform basic work activities because they were controlled with medication, were treated conservatively, and no objective tests showed abnormalities.

At the hearing before the ALJ plaintiff testified that medication helped control her headaches. (Tr. 47.) Plaintiff repeatedly reported to her doctors that her headache condition was improved with medication. (Tr. 653, 794, 868, 871-72, 875, 898, 943, 945.) Plaintiff admitted at multiple medical appointments that her headaches returned

when she ran out of medication.  (Tr. 558, 588-89, 600, 605, 653, 775, 794, 852, 855, 869, 873, 876, 892, 894, 897, 918, 922, 947.)

The ALJ also found that plaintiff's headaches were non-severe because the objective findings from her examinations were generally normal or minimal.  Plaintiff received multiple CT scans of her head and brain, all of which found no significant abnormalities.  (Tr. 11, 292-93, 305, 421, 471-74.)  Plaintiff also usually denied other symptoms in association with her headaches.  (Tr. 614, 653, 775-76, 855, 868, 871-72, 875, 892, 943, 945.)  The ALJ found it significant that plaintiff was seen in the emergency room on seven different occasions since January 2010, but was discharged without being admitted to the hospital each time.  (Tr. 11, 588-90, 753-56, 771-76, 852-57, 871, 876, 892-98, 918-24.)  Moreover, there is no record evidence that plaintiff ever saw a specialist for her headaches.  Further, plaintiff did not require any significant intervention other than medication to treat her headaches.  (Tr. 11-12.)  See e.g., Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (impairments that can be controlled by medication cannot be considered disabling).  See e.g., Martise v. Astrue, 641 F.3d 909, 924 (8th Cir. 2011) (affirming ALJ's decision that headaches were non-severe in part because medication controlled her symptoms).

The undersigned concludes the record contains substantial evidence indicating that plaintiff's headaches were controlled with conservative treatment consisting of medication.  Therefore, the ALJ did not err in finding that plaintiff's headaches were not a severe impairment.

### B.  Residual Functional Capacity (RFC)

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence.  RFC is defined as the most that a claimant can still do despite her physical or mental limitations.  20 C.F.R. § 416.945(a).  Some medical evidence must support an ALJ's RFC assessment, but the ALJ is not limited to considering medical evidence exclusively.  See Cox v. Astrue, 495 F.3d 614, 619-20 (8th Cir. 2007).  "The ALJ determines a claimant's RFC based on all relevant evidence, including medical records,

observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The burden of persuasion to prove disability and demonstrate RFC is on the plaintiff. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005). An RFC assessment is ultimately an administrative determination reserved to the Commissioner, not a medical professional. See Cox, 495 F.3d at 619-20.

The ALJ is not obligated to rely entirely on a medical opinion to formulate a claimant's RFC. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011). Although an ALJ's RFC determination must be supported by some medical evidence, an ALJ is not limited to such evidence. See Cox, 495 F.3d at 619. An ALJ should consider all relevant evidence, including medical records, observations from treating physicians, and the claimant's subjective statements about his limitations. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). When considering the RFC of a claimant with a severe impairment that does not meet or equal a listed impairment, the ALJ must consider the limiting effects of all of the claimant's impairments, including those that are non-severe. See 20 C.F.R. § 404.1545(e). The ALJ must consider the impairments individually and in combination when determining the claimant's RFC. See Raney v. Barnhart, 396 F.3d 1007, 1011 (8th Cir. 2005). It is proper for an ALJ to consider a claimant's daily activities when formulating the claimant's RFC. See Green v. Astrue, 390 F. App'x 620, 622 (8th Cir. 2010). Further, an ALJ may discredit a claimant's subjective statements if they are inconsistent with the claimant's daily activities. See Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009).

In this case, the ALJ determined that plaintiff had the RFC to perform a full range of work at all exertional levels, but that she had several non-exertional limitations. (Tr. 13.) The ALJ properly considered plaintiff's non-severe impairment of headaches when determining her RFC by imposing non-exertional limitations concerning her exposure to noise, vibrations, and hazards. (Tr. 11, 13.) Plaintiff argues that her headaches justified additional work-related limitations, but does not cite any medical evidence to support this assertion. Plaintiff presented no record evidence to support greater limitations on RFC

than those imposed by the ALJ and therefore her assertions regarding her limitations do not undermine the ALJ's analysis.

The ALJ considered the medical records, the observations of plaintiff's treating physicians, and plaintiff's subjective statements about her headaches. (Tr. 11, 13-15.) Despite the lack of a supporting medical opinion regarding limitations imposed by plaintiff's headaches, the ALJ properly considered the medical evidence. See, e.g., Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (ALJ's RFC determination was proper when supported by some medical evidence, despite silence of evidence on the work-related limitations imposed by medical condition); Cox, 495 F.3d at 619-20 (despite lack of medical opinion that assessed claimant's work limitations, treatment notes provided substantial medical evidence to support RFC assessment). In considering all of the relevant evidence, the ALJ properly considered plaintiff's non-severe condition of headaches when formulating her RFC. Further, plaintiff failed to meet her burden of persuasion regarding RFC because she failed to present evidence of additional limitations caused by her headaches.

Plaintiff also argues that the ALJ erred in assessing her RFC by relying on her own statements about her daily activities which included performing her own personal care, cleaning house, walking, shopping, performing household chores, and watching television. The ALJ determined that the activities plaintiff performed supported his conclusion that plaintiff could perform simple, repetitive tasks in a non-public setting despite her severe impairment of depression. (Tr. 15.) Plaintiff also claimed that her mental impairment prevented her from working. The ALJ noted, however, that plaintiff's daily activities were inconsistent with her claim. This court concludes the ALJ properly considered evidence of plaintiff's daily activities as a factor in formulating her RFC. Accordingly, plaintiff's argument is without merit.

### C. ALJ's Hypothetical

Plaintiff next argues that the ALJ erred by posing a hypothetical question that did not accurately represent the concrete circumstances of plaintiff's impairment.

In the fifth step of the sequential analysis, the burden shifts to the Commissioner to show that plaintiff could perform other work existing in significant numbers in the national economy. See 20 C.F.R. § 416.920(a)(4)(v). A VE's testimony constitutes substantial evidence if it is based on a correctly phrased hypothetical that captures the concrete circumstances of the claimant's deficiencies. See Cox v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007). The hypothetical must include only those impairments that the ALJ finds are substantially supported by the record as a whole. See Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012). The ALJ is not required to adopt unsupported, unsubstantiated, subjective, or self-imposed limitations of the plaintiff when questioning the vocational expert. Perkins v. Astrue, 648 F.3d 892, 902 (8th Cir. 2011).

Here, the ALJ questioned the VE about a hypothetical claimant with the same age, education, experience, and RFC as plaintiff. The VE testified that such a claimant would be employable. The ALJ posed a second hypothetical, adding the conditions that the claimant should avoid concentrated exposure to noise, vibrations, and hazards. The VE opined that such a claimant would also be capable of performing jobs available in significant numbers in the national economy. Plaintiff's attorney then posed a third hypothetical, with the additional condition that the claimant would be required to leave her workstation for 30 minutes a day that could not be accommodated by breaks. The VE determined that such a claimant might be able to secure employment, but unable to maintain it. (Tr. 16, 61-65.)

Plaintiff asserts that the ALJ's hypotheticals did not accurately represent her concrete circumstances because they failed to capture the effects of her headaches. Here, the ALJ properly included impairments and limitations that were substantially supported by the record evidence as a whole in his questions to the VE. As discussed above, plaintiff's headaches were properly considered in the calculation of her RFC. Further, plaintiff's subjective and self-imposed limitations regarding her work ability were properly excluded from the ALJ's hypothetical questions to the VE. There is no support in the record for plaintiff's assertion that additional limitations were warranted. The ALJ

did not err in treating the VE's testimony as substantial evidence. Accordingly, plaintiff's argument is without merit.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

        /S/   David D. Noce      
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 18, 2015.